**Petition for Naturalization of SUEY CHIN.**

United States District Court
S. D. New York.
May 18, 1959.

Paige & Paige, New York City, by Samuel Paige, and Norma Z. Paige, New York City, of counsel, for petitioner.

William Dunlop, U. S. Naturalization Examiner, New York City, for the Government.

WEINFELD, District Judge.

Petitioner, an honorably discharged veteran of World War II, filed a petition for naturalization under section 329 of the Immigration and Nationality Act.[1] Denial of his application has been recommended by the Naturalization Examiner on the ground that he has failed to establish the requisite good moral character.

Petitioner, a native and citizen of China, entered this country in 1931 as a seaman under a sixty-day permit. He has remained here since. During the pendency of his petition for naturalization, a deportation proceeding was commenced against him under section 241 (a) (2) of the Immigration and Nationality Act of 1952,[2] on the ground that after his admission as a non-immigrant, he remained in the United States for a longer time than permitted. Upon the hearing, it developed that petitioner had been convicted between 1933 and 1953 on eight occasions of opium smoking, the possession of opium, opium apparatus, hypodermic needle, and the possession of heroin. The charges against him were then expanded to include as a further ground for deportation his convictions for the illicit possession of narcotics.[3]

The Special Inquiry Officer found petitioner deportable by reason of convictions in 1941 and 1953 based upon his illicit possession of narcotic drugs in violation of New York State's laws.[4] He noted, however, that since petitioner had been in active-duty service in the Armed Forces in World War II, the fact that he had not been lawfully admitted to the United States was no bar to citizenship.[5]

Since action on petitioner's application for citizenship was foreclosed so long as the deportation proceeding was pending,[6] the Special Inquiry Officer terminated the latter proceeding for the sole purpose of affording petitioner a hearing on his previously filed petition for naturalization. The Special Inquiry Officer based his action on "appealing humanitarian factors" which he specified as petitioner's presence in the United States for over a quarter of a century; his age, 44 years; the fact that he has a citizen wife; and that he was an honorably discharged World War II veteran with several service citations.[7]

1.  8 U.S.C.A. § 1440.

2.  8 U.S.C.A. § 1251(a) (2).

3.  Immigration and Nationality Act of 1952 § 241(a) (11), 8 U.S.C.A. § 1251(a) (11). "Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who * * * at any time has been convicted of a violation of * * * any law or regulation relating to the illicit possession of * * * narcotic drugs * * *."

4.  N.Y.Public Health Law [McKinney's Unconsol.Laws, c. 45], § 422 (now § 3305).

5.  Immigration and Nationality Act of 1952 § 329(a) (1), 8 U.S.C.A. § 1440(a) (1).

6.  Immigration and Nationality Act of 1952 § 318, 8 U.S.C.A. § 1429: "* * * no petition for naturalization shall be finally heard by a naturalization court if there is pending against the petitioner a deportation proceeding * * *."

7.  The findings terminating the deportation proceeding "shall not be deemed binding in any way upon the naturalization court with respect to the question of whether [petitioner] has established his eligibility for naturalization * * *." Immigra-

The evidence relied upon before the Naturalization Examiner was essentially that presented before the deportation officer. In substance, it showed the various narcotic convictions from 1933 to 1953; that petitioner had been a drug addict for approximately fifteen years; and that he had resumed the regular use of narcotics after his discharge, at his own request and against medical advice, from the U. S. Public Health Hospital at Lexington, Kentucky, which he had entered as a voluntary patient for treatment and cure of his addiction.

The Naturalization Examiner concluded that petitioner had failed to sustain his burden of showing good moral character "during a reasonable period of time immediately preceding the date of the petition" (May 14, 1957), and accordingly recommended denial of the petition. The Examiner, however, did not specify just what period he considered reasonable, but found that petitioner "has habitually used narcotic drugs since his discharge" on October 25, 1956 from the U. S. Public Health Service Hospital.

Two questions are posed: (1) the period during which petitioner is required to establish good moral character, and (2) whether he has failed to sustain his burden of proof by reason of his habitual use of drugs.

As to the first question, section 329(b) (2) of the Immigration and Nationality

Act [8] exempts honorably discharged active service veterans of World Wars I and II, from the five-year residence provision of section 316(a).[9] Since the period during which an applicant is required to establish good moral character refers back to the residence subsection,[10] the result of this exemption is the absence of any fixed period of time during which a veteran applying for citizenship under section 329 is required to establish good moral character. The Immigration and Naturalization Service states that "it has been the standard practice in determining whether the requirement of good moral character has been met to give consideration to petitioner's conduct during a reasonable period of time immediately preceding the date of the petition", but it has submitted no authorities. Court decisions on the subject are sparse. Such rulings as are extant hold that the period of good moral character is to be determined at least from the date of the filing of the petition for naturalization to the date of the hearing.[11]

█ If this view, most favorable to petitioner, were accepted, his last conviction in February 1953—more than four years prior to the filing of his petition, would not necessarily bar citizenship.[12] The Immigration Service correctly contends, however, that the test is not conviction of crime but rather good

tion and Nationality Act of 1952 § 318, 8 U.S.C.A. § 1429.

8. 8 U.S.C.A. § 1440(b) (2): "A person filing a petition under subsection (a) of this section shall comply in all other respects with the requirements of this subchapter, except that * * * (2) no period of residence or specified period of physical presence within the United States or any State shall be required * * *."

9. 8 U.S.C.A. § 1427(a): "No person * * * shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years * * *, and (3) *during all the period referred to in*

*this subsection* has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." (Emphasis supplied.)

10. See note 9 supra.

11. Yuen Jung v. Barber, 9 Cir., 184 F.2d 491. The Court did not consider section 329 of the Immigration and Nationality Act of 1952 but a substantially similar section, 324A, added to the Nationality Act of 1940 by a 1948 amendment, 62 Stat. 282. In referring to this section the Court cites to 8 U.S.C.A. where the section appeared as number 724a.

12. Daddona v. United States, 2 Cir., 170 F.2d 964, certiorari denied 336 U.S. 961, 69 S.Ct. 889, 93 L.Ed. 1113.

moral character for the required period, and it urges that petitioner has failed to sustain his burden of proof on this issue.

Thus we reach the second question, whether petitioner's habitual use of narcotic drugs,[13] at and subsequent to the filing of his petition for naturalization, precludes a finding that he is a person of good moral character.

█ While petitioner's conduct prior to the date of filing his petition may not be used as a basis for denial of naturalization, it may be considered as bearing upon the question of good character within the requisite period.[14]

The Government, in urging denial of petitioner's request for citizenship, relies upon his admission that off and on he has been a narcotic addict for fifteen years; that following his release from the U. S. Public Health Service Hospital in October, 1956, contrary to medical advice, he had resumed the regular use of drugs. When questioned on August 27, 1957 upon the initiation of the deportation charges, he stated he had last used narcotics a week before by sniffing heroin; that he used them on an average of twice a month. At a hearing on September 3, 1957 petitioner sought to disavow his previous answers, saying he had not

really meant that he used drugs twice a month but only when someone offered them to him, and that in fact he had not used any since December 1956. However, at a further hearing on October 2, 1957, petitioner, then represented by counsel, acknowledged the truth of the statements made at the first hearing on August 27, 1957. Under this circumstance, the record justifies acceptance of his admissions, twice made, that at, and before, the filing of his petition for naturalization on May 14, 1957, and continuing thereafter at least to the date of the commencement of the deportation proceeding on August 27, 1957, petitioner was using drugs at least twice a month. Indeed, in the light of his addiction over a fifteen-year period it is questionable that his use is so limited.

Up to recent times, whether a drug addict was to be regarded as a criminal or a sick person has been the subject of much controversy.[15] While the subject is still mooted, the modern view, which finds increasing acceptance among substantial numbers of the medical and legal professions, judges, sociologists and penologists, is that addicts or users are sick persons who require medical treatment[16]—in sum, the addict presents a social and a medical problem. Whether this view, entertained principally by

13. While the petitioner urges that he is a user of drugs as distinguished from an addict, there is no occasion here to consider the alleged distinction. The evidence abundantly establishes that he is an habitual user and an addict. The eight convictions for violations of narcotic laws, plus petitioner's admission that, on and off he has been a narcotic addict for about fifteen years, and his further admission of the periodic use of drugs after his discharge from the U. S. Public Health Hospital leaves no room to doubt that he is an addict. "The term 'addict' means any person who habitually uses any habit-forming narcotic drugs so as to endanger the public morals, health, safety, or welfare, or who is or has been so far addicted to the use of such habit-forming narcotic drugs so as to have lost the power of self-control with reference to his addiction * * *." 58 Stat. 683 (1944), 42 U.S.C.A. § 201(k).

14. Immigration and Nationality Act of 1952 § 316(e), 8 U.S.C.A. § 1427(e). Other circuits took this view even before the enactment of this section. Marcantonio v. United States, 4 Cir., 185 F.2d 934, 936; Yuen Jung v. Barber, 9 Cir., 184 F.2d 491.

15. "As long ago as 1939 a League of Nations committee established to decide whether an addict was a criminal or a sick person could reach no agreement on the issue." Report of the State of New York Joint Legislative Committee on Narcotic Study 35 (Legis.Doc. No. 7, 1959).

16. Cf. Interim Report of the Joint Committee of the American Bar Association and the American Medical Association, Some Basic Problems in Drug Addiction and Suggestions For Research (1958).

members of professional groups, is accepted by the average person is not readily apparent.

█ But whatever view one takes, the question remains whether the petitioner, as an habitual user of narcotics, has met the requirement of good character which the law demands of those seeking the privilege of citizenship. In deciding the issue of good moral character the Court's individual attitude is not the criterion. The test applied, with its acknowledged shortcomings and variables, depending upon time and place, is the norm of conduct accepted by the community at large.[17] Indeed the Court must be careful to avoid substituting its own judgment for that of the community.[18] As stated by our Court of Appeals, the test is

" * * * not those standards which we might ourselves approve, but whether 'the moral feelings, now prevalent generally in this country' would 'be outraged' by the conduct in question: that is, whether it conformed to 'the generally accepted moral conventions current at the time.' "[19]

While it may be argued, and there are some who do,[20] that the habitual use of and addiction to narcotic drugs, in and of itself, does not necessarily brand one as lacking in good moral character, that does not answer the inquiry. The issue cannot be resolved in a vacuum or on the basis of forensic discussion. It must be considered against the cold, hard facts of a complex problem which involves not only the user but others and the community as well. The fact is that the addict is at the vortex of the cross currents of the medical, social and criminal aspects of a most difficult issue—one which has given stubborn challenge to public authorities for the past half century.

The addict does not live a life of isolation. The problems presented by his drug use are not individual. They touch and affect the entire community. The addict's affliction and the consequences that follow in its wake are no more confined to him than they are in the instance of one who is plagued by a contagious disease. Granted that the addict needs medical help, hospital care or even confinement in the effort to break him of his habit, his dependency upon the prohibited drug forces him, under existing laws and conditions to deal with criminal and underworld elements. To obtain his supply, he is driven into contact with the narcotic trafficker—the non-user, or peddler. And the receipt of narcotics by the addict, whether by purchase, or for services rendered as a "pusher" in order to obtain his required supply, or even by way of gift, makes him a pawn in the constant transgression of narcotics laws, involving himself and others. The law, particularly Federal, recognizes no distinction between the user-victim and the despicable non-user commercial distributor. Thus, an addict in his efforts to satisfy his craving, is caught in a maelstrom of constant criminal con-

17. Cf. Cardozo, The Paradoxes of Legal Science 37 (1928) : "Law accepts as the pattern of its justice the morality of the community whose conduct it assumes to regulate." See also United States v. Kennerley, D.C.S.D.N.Y., 209 F. 119; People [on Complaint of Sumner] v. Miller, 155 Misc. 446, 279 N.Y.S. 583, 584: "The criterion of decency is fixed by time, place, geography and all the elements that make for a constantly changing world."

18. Cf. United States ex rel. Iorio v. Day, 2 Cir., 34 F.2d 920; United States v. Levine, 2 Cir., 83 F.2d 156, 157, where Judge Learned Hand cautioned that a trier of the fact, in determining the acceptable standard which satisfies the moral demands of the community, must avoid his "personal aberrations". See also Parker, C. J. in Marcantonio v. United States, 4 Cir., 185 F.2d 934, 937: "The test * * * is * * * not the judge's idea of the 'type of man who ought to be admitted to citizenship' * * *."

19. Repouille v. United States, 2 Cir., 165 F.2d 152, 153.

20. See, e. g., N. Y. State Bar Ass'n, Report of Committee on Public Health 6 (December 31, 1958).

duct and association with criminal elements. An addict, whether he wills it or not, spawns crime and is, in a sense, a crime breeder, bringing difficult and complex problems of law enforcement to the community. Their solution has become a major activity of Federal, State and local governments.

Congress, in the effort to cope with these challenging problems, has determined that separate and multiple offenses may result from a single narcotic transaction, and the Supreme Court has upheld such laws, recognizing them as "controls devised by Congress as means for dealing with a social evil as deleterious as it is difficult to combat * *." [21]

In the continuing fight against illegal narcotic trafficking, we have seen within a comparatively short time the passage by Congress of laws which require the imposition of mandatory minimum sentences,[22] long term imprisonment [23] and even the death penalty.[24] State legislatures have similarly increased the penalties for narcotic offenses. The wisdom or the desirability of such legislation of course is not for the Court but it points up the seriousness of the problem and the constant effort to combat the evils inherent both in the illicit use and distribution of narcotics.

In the instant case, petitioner's relationship to those engaged in illicit drug distribution is evident from his admission that he obtains his requirements of drugs from former inmates of the U. S. Public Health Service Hospital at Lexington, Kentucky, whom he met while himself confined there; that he obtained

narcotics easily from them; that he did not know their names nor did they have fixed places of abode. Whether petitioner pays for his supply or receives it gratis, as he contends, illicit narcotics are involved.

Apart from fostering crime on the part of others, the addict, to gratify his wants, will lie, cheat and steal and otherwise engage in activities that clearly offend accepted moral conventions. All concepts of normal behavior are uncontrollably subordinated to the single purpose of obtaining, one way or another, a constant source of supply. The daily flow of cases in this and other Courts discloses tragic situations where family, friends and profession are sacrificed to the inordinate desire that must be fed. Moral deterioration is the end result.

█ Against the background of the close affinity of narcotic addiction to crime, [25] the constant fostering of criminal activity and law violation, and the moral deterioration which sets in, can it be said that the addict is accepted today as a person of good moral character in the eyes of the average citizen of the community? Clearly, whatever the future attitude may be, the unfortunate victim of the drug habit does not currently command respect in the eyes of fellow citizens.

Finally, perhaps the existing public attitude may be gleaned from the enactment in 1952 of a provision in the Immigration and Nationality Act which, for the first time, made drug addiction a deportable offense.[26] Previously an addict who was not a peddler or seller was

21. Gore v. United States, 357 U.S. 386, 389, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405.

22. These were first imposed in 1951, 65 Stat. 767. See S.Rep. No. 1051, 82d Cong., 1st Sess. (1951).

23. The penalties were increased in 1956, 70 Stat. 570. See H.R.Rep. No. 2388, 84th Cong., 2d Sess. 10–12 (1956); S. Rep. No. 1997, 84th Cong., 2d Sess. 5–6 (1956).

24. 70 Stat. 571 (1956), 21 U.S.C.A. § 176b.

This penalty is authorized "if the jury in its discretion shall so direct."

25. As has been stated by a Congressional Committee: "Narcotic addiction with its close affinity to crime is an ever-present problem for every community in the country * * *." H.R.Rep. No. 2388, 84th Cong., 2d Sess. 62 (1956).

26. Immigration and Nationality Act of 1952 § 241(a) (11), 8 U.S.C.A. § 1251 (a) (11). See S.Rep. No. 1137, 82d Cong., 2d Sess. 21–22 (1952); H.R.Rep. No. 1365, 82d Cong., 2d Sess. 59–60 (1952).

**516**

not deportable.[27] It may well be said that by this change in the law Congress reflected the current views of the national community.

■ Even were the assumption to be made that doubt exists as to whether the petitioner has sustained his burden of proof as to his qualification for citizenship, the doubt is to be resolved in favor of the Government and against the petitioner.[28]

The petition is denied.

---

27. 46 Stat. 1171 (1931), as amended, 54 Stat. 673 (1940). This section was repealed on June 27, 1952, 66 Stat. 279. See Nicoli v. Briggs, 10 Cir., 83 F.2d 375.

28. United States v. Manzi, 276 U.S. 463, 467, 48 S.Ct. 328, 72 L.Ed. 654.